UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

ANDRE GLADNEY,

                           Plaintiff,                    No. 08-CV-6578 CJS

    -vs-

                                                     DECISION AND ORDER

WEGMANS FOOD MARKETS,

                           Defendant.

———————————————————————

APPEARANCES

For Plaintiff:                 Andre Gladney, *pro se* [1]
                                 322-D Chatham Gardens
                                 Rochester, New York 14605

For Defendant:              Robert C. Weissflach, Esq.
                                 Harter Secrest and Emery LLP
                                 12 Fountain Plaza, Suite 400
                                 Buffalo, New York 14202-2293

INTRODUCTION

In this action Andre Gladney ("Plaintiff") is alleging that Wegmans Food Markets ("Defendant") discriminated and retaliated against him in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. Now before the Court is Defendant's motion for summary judgment [#38], and Plaintiff's cross-motion [#39] for summary judgment. For the reasons that follow, Defendant's application is granted, Plaintiff's application is denied, and this action is dismissed.

---

[1] Defendant provided Plaintiff with the Notice to *Pro Se* Litigants required by Local Rule of Civil Procedure 56.2. (Docket No. [#38-2]).

BACKGROUND

Unless otherwise noted, the uncontested facts of the case are set forth in

Defendant's Statement of Undisputed Facts submitted pursuant to Local Rule 56.1, to

which Plaintiff did not file a counter-statement. *See*, Local Rule of Civil Procedure

56(a)(2) (Indicating that those portions of the moving party's statement of facts that are

not specifically denied are deemed admitted).  Although the Court will discuss those

facts further below, they were accurately summarized by Defendant as follows:

> Gladney alleges that Wegmans discriminated against him on account of
> his alleged disability (arthritis in his ankle), although he produced no
> evidence that he is substantially limited in any major life activity and
> actually admits that he is not substantially limited. Even if Gladney were
> disabled within the meaning of the ADA, his principal complaint is that
> Wegmans discontinued his short-term disability benefits after he admittedly
> reached the maximum benefit period (26 weeks) provided for by New York
> State law. Gladney also alleges that Wegmans retaliated against him by
> making phone calls to his health insurance carrier and a legal aid society,
> although he admits he has no evidence that anyone at Wegmans
> contacted those entities. Finally, Gladney alleges that Wegmans retaliated
> against him with respect to certain withdrawals from his 401(k) account,
> although he admits that all of the withdrawals he requested were approved
> and paid.

Def. Memo of Law [#38-30] at 1.

Beginning in May 2007, Plaintiff worked in Defendant's Bakery Department.  Prior

to that, Plaintiff had worked in Defendant's Meat Department for several years.  On or

about June 29, 2007, Plaintiff informed Defendant that he would be out of work due to

pain in his right foot.  Subsequently, Plaintiff applied for short-term disability benefits, at

which time his podiatrist, Michael Giordano, D.P.M. ("Giordano"), indicated that the

medical condition was not work related.[2]  Plaintiff's disability claim was approved, and he received 26 weeks of disability benefits, from July 2007 through January 5, 2008.[3]  In or about August 2007, Plaintiff had surgery on his foot.  It was Defendant's policy to maintain employees' employment and benefits for up to six months, during periods of disability.  In this regard, Defendant kept its employees' jobs open and continued to provide their benefits, such as health insurance, but did not pay regular wages.  In October 2007, Defendant notified Plaintiff that it would continue to maintain his employment and benefits for another three months, until January 2008.  Actually though, because Plaintiff was not able to return to work until February 2008, Defendant maintained Plaintiff's position and benefits for an additional month, for a total of seven months.

As previously mentioned, Plaintiff received six months, or 26 weeks, of disability payments, which ended on January 5, 2008.  On or about January 9, 2008, Plaintiff telephoned Defendant to complain about the fact that his payments had stopped, and he spoke with a "benefits analyst" named Donato ("Donato").  Donato advised Plaintiff that his payments had stopped because he had received all of the benefits to which he was entitled.[4]  Donato further advised Plaintiff that he could file an appeal with the New York

---

[2]*See, e.g.*, Docket [#38-21], line 8 (Giordano indicated that in his opinion, Plaintiff's right foot problem was not work-related).

[3]Although the maximum disability payment required by New York law is $170. per week, Defendant supplemented that amount, so that Plaintiff received 90% of his usual pay for the first ten weeks, and then 75% for the remaining sixteen weeks. Pl. Dep. [#38-13] at 117.

[4]*See*, Wegman's Fresh Starts Employee Manual [#38-15] at 10 ("After thirty days of service with Wegmans, you are eligible to receive disability pay if you become medically unable to work. . . . It can be paid for a maximum of twenty-six weeks.")

State Worker's Compensation Board, Disability Benefits Bureau ("Worker's Comp Board").  Plaintiff was extremely upset and offended by his conversation with Donato, since he maintains that Donato was rude to him.  In fact, as discussed further below, Plaintiff admits that his conversation with Donato was a primary motivating factor behind him filing complaints against Defendant and eventually commencing this action.[5]  In any event, Plaintiff filed an appeal with the New York State Workers' Compensation Board, Disability Benefits Bureau, which denied the appeal [#38-22], because Plaintiff had received a full twenty-six weeks of benefits.  Nevertheless, Plaintiff apparently believes that he was entitled to receive unlimited disability payments, and that the termination of payments after twenty-six weeks was discriminatory. Pl. Deposition [#38-13] at 95-96 ("Q. What about the termination of your benefits after six months?  Are you claiming that's discriminatory?  A. Yeah, I didn't feel that was right either.  *I don't understand how they could have run out*, that's what gets me.  I paid for everything.") (emphasis added); *see also, id*. at 84 ("I don't understand how benefits can run out[.]").

At around this same time, Plaintiff filed a Worker's Compensation Claim, alleging that his foot injury was work related, even though he and Giordano had previously indicated that it was not work-related.  The Worker's Comp Board dismissed the claim [#38-23].  In doing so, the Worker's Comp Board indicated that Plaintiff had not submitted "prima facie medical evidence" to support the claim," and that "[u]pon submission  of [such evidence], the case will be evaluated to determine further Board action." *Id*.  However, Plaintiff never submitted such evidence.  As to that, at deposition

---

[5] *See, e.g*., Pl. Deposition at 9-13, 140-141.

4

Plaintiff stated that he never got around to doing so. Pl. Dep. 17 ("I got the papers  that the [Workers' Compensation] judge told me to get, but I didn't make it back down there because I had my second surgery and I was laid up for awhile after the second one[.]"); *see also, id*. at 103-104.[6]

On February 4, 2008, Giordano cleared Plaintiff to return to work half days, and Defendant accommodated that restriction and allowed Plaintiff to return to work.  Plaintiff worked half days until March 26, 2008, when Giordano indicated [#39] that Plaintiff was completely unable to work, due to "nerve pain."

On March 27, 2008, Plaintiff filed an employment discrimination complaint [#38-7] against Defendant  with the New York State Division of Human Rights ("NYSDHR"), alleging discrimination on the basis of disability.  Plaintiff stated that he was disabled due to arthritis.  When asked to write out the description of his complaint, Plaintiff attached four pages of handwritten notes, divided up into dated entries covering the period September 20, 2007 through January 23, 2008.  The notes, frankly, do not describe instances of disability discrimination.  The notes do, however, describe Plaintiff's conversation with Donato, following the termination of Plaintiff's short-term disability payments after twenty-six weeks: "Talked to Dinado [Donato] about the rejection papers, he was kind of rude and loud talking, said what I was trying to say was irrelevant  he told me to call the state call social security [sic]." ([#38-7] at 5).  The notes also express frustration with the process of making a hardship withdrawal from Plaintiff's 401(k) account.  Subsequently, Plaintiff told a NYSDHR representative that Defendant

---

[6]The Worker Comp claim was dismissed on April 28, 2008 [#38-23].  Plaintiff's second ankle surgery was not until August 2008 or later.

"intentionally tries to bring him down." ([#38-8])  When asked to explain, Plaintiff stated

that his health insurance provider had recently[7] refused to pay for physical therapy

treatment, and  he suspected that Defendant was to blame [#38-8].  As to this suspicion,

Plaintiff alleges that his health insurance provider refused to pay for certain medical

treatments because he had a Worker's Comp claim pending, and he contends that

Defendant told his insurance provider to withhold payment, though he has no personal

knowledge about that. *See*, Pl. Dep. at 125-128.  Plaintiff also told the NYSDHR

representative that Donato was "rude and loud and would not let him talk," and told him

that "his life was irrelevant." ([#38-8])  Plaintiff further stated that Donato "was a nasty

person to everyone." *Id*.  On July 1, 2008, NYSDHR dismissed Plaintiff's complaint,

finding "no probable cause too support the allegations of the complaint." [#38-9]

On April 29, 2008, Plaintiff resumed working half days.  Again, Defendant

accommodated Plaintiff's half-day restricted schedule.  Plaintiff continued to work half

days until July 30, 2008, when Giordano indicated [#38-24] that Plaintiff was completely

unable to work, and needed further surgery.  Defendant indicated that it would again

hold Plaintiff's position open for him, and maintain his benefits, for a period of six

months.

On August 24, 2008, while Plaintiff was out of work, he applied for a "hardship"

distribution from his 401(k) savings plan account.  More specifically, Plaintiff applied to

withdraw $969.00, which was the maximum that he could take pursuant to the terms of

the plan. *See*, Pl. Dep. [#38-13] at 136.  Approximately two weeks later, Plaintiff

---

[7]Plaintiff indicates that the incident with his health insurance provider occurred on or about April 16, 2008. Pl. Dep. at 129.

6

received the requested distribution [#38-25].   Nonetheless, he believes that it was

discriminatory for there to be a limit on the amount that he could withdraw.   *See*, Pl. Dep.

at 25-26 ("[H]ow can you tell me only nine hundred and sixty-nine dollars is available,

and that's before taxes, if they know they're not going to pay me?  . . .   Why would I

have to show someone what I need my money for if you know you're not paying me?");

*id*. at 31 ("I feel they kept money out of my hands intentionally for me to struggle

because I complained.").

On December 3, 2008, Defendant sent Plaintiff a letter reminding him that it

would maintain his employment and benefits for a total of six months during his period of

disability.

In or about December 2008, Plaintiff consulted with an attorney at a legal aid

organization in Rochester. Pl. Dep. [#38-13] at 17-20.   Plaintiff maintains that when he

checked back with the attorney, the attorney asked him about disability payments that

he was receiving. *Id*. at 18.   Plaintiff indicates that he was not receiving any such

disability payments at that time, and that such false information must have come from

Defendant, which was trying to "blackball" him. *Id*. at 18-20 ("If you've never seen me,

how did you have papers about me and the money?   That's what I'm saying.   There's

only one way possible.   The didn't get it from me.  . . .   That's blackballing to me.  . . .

[B]asically trying to prevent me from getting legal help in the matter.   If you can put

papers out there on me, you can reach out and try to cause any conflict possible just

from me complaining, it's all — which I believe and know it's all from me standing up and

fighting for myself.").   However, Plaintiff does not explain how Defendant would have

known that he was consulting with a legal aid attorney, nor can he provide any evidence

that Defendant actually contacted this attorney. *Id*. at 20, 23-24.  In fact, the attorney

later told Plaintiff that the reference to him receiving payments had been an error,

although Plaintiff did not believe him. *Id*. at 22 ("And then he tried to say, oh, I found that

it was a paper error.").

On December 23, 2008, Plaintiff filed the subject action, alleging discrimination in

violation of the ADA.  In his Complaint, Plaintiff states that the alleged discrimination

began on January 11, 2008, which he describes as being the date of his phone

conversation with Donato. (Complaint at ¶ 19).  Plaintiff also states that discrimination

occurred on April 16, 2008, when he learned that Defendant "lied" to his health

insurance provider.  Plaintiff states that Defendant "lied," causing him a "financial

burden," and retaliated against him.  When asked to briefly state the facts of his case,

Plaintiff wrote:

> January 11, 2008 I had a phone conversation with the company's head of
> benefits department about why my benefits were being rejected in which I
> could barely get a word out due to his attitude and rudeness when I state
> that [sic] what about me and my problems I have to deal with for the rest of
> my life from a condition I obtained working for this company his response
> was that was irrelevant call the state call social security this was a
> recorded conversation but obvious[ly] he didn't care the nurse from my
> doctor's office can vouch for the rude attitude of this guy she said they've
> had problems with him in the past.

Complaint at ¶ 19.

Meanwhile, Plaintiff remained out of work.  Yet, even after Plaintiff had been out

of work for six months, Defendant did not terminate his employment or benefits.

Instead, Defendant asked Plaintiff to submit medical documentation verifying his need

for continued leave.  However, Plaintiff failed to provide the requested documentation.

Subsequently, on March 23, 2009, Defendant sent Plaintiff a letter [#38-27] stating that he had to provide a medical note verifying his need for continued disability leave, and that if he did not, Defendant would assume that he had abandoned his job, and would terminate his employment and benefits.  Specifically, in such letter,  Elaine Clack ("Clack"), Human Resources Representative, stated that Defendant had asked Plaintiff for additional medical information on three occasions, February 11, 2009, February 18, 2009, and March 20, 2009, and that the information had not been received [#38-27]. Clack further indicated that although Plaintiff had told her, on March 20, 2009, that his doctor had faxed a note to Defendant, such fax was never received. *Id*. Clack ended her letter by stating that Plaintiff needed to provide the requested information by March 31, 2009. *Id*.

 Defendant, though, never received the requested information.  Consequently, on April 9, 2009, Defendant terminated Plaintiff's employment.  In that regard, in a letter to Plaintiff [#38-28] dated April 9, 2009, Clack stated, *inter alia*, that, "[t]o date, I have not received any updated medical information from you or your medical provider.  As a result, your employment is terminated effective today, April 9, 2009."  On this point, the record indicates that the last doctor's note which Defendant received was one from Giordano written on July 21, 2008, more than eight months earlier.  Prior to terminating Plaintiff, Defendant had maintained Plaintiff's employment and benefits for a period of more than eight months in which he did not work.  After Plaintiff's employment ended, he requested, and was sent, the balance of his 401(k) savings account.

 On May 5, 2010, Defendant filed the subject motion for summary judgment.  On May 5, 2010, Plaintiff filed a document [#39] purporting to be a cross-motion for

summary judgment. In his filing, Plaintiff states, "I believe my lawsuit has merit because of the retaliation and discrimination I have endured by the defense and its witnesses." Plaintiff further states that he attempted to obtain a lawyer, but the lawyers were "all booked and [were] not taking any more cases." Additionally, Plaintiff states that Defendant is lying about the fact that it terminated him because he failed to provide information concerning his medical condition. As to this contention, though, Plaintiff submits only a note from Giordano dated August 17, 2007, which was apparently submitted to Defendant at that time. From this, Plaintiff apparently argues that Defendant cannot claim that it did not have sufficient "contact information" about his doctor.[8] It appears to be Plaintiff's position that it was Defendant's responsibility to contact Giordano to obtain the requested information.

In response to Plaintiff's cross-motion, Defendant contends that Plaintiff's focus on the termination of his employment in April 2009 is misplaced and irrelevant to this action, since it occurred long after the alleged discrimination and retaliation at issue in this lawsuit. (Weissflach Decl. [#40] at ¶ 5). Defendant further maintains that Plaintiff's Complaint in this action does not allege wrongful termination or retaliation involving the termination of his employment. Further, Defendant argues that it properly terminated Plaintiff's employment, after providing him with more than eight months of leave time, because he did not provide requested information concerning his medical condition.

On June 10, 2010, Plaintiff filed an unsworn declaration [#42] and memorandum of law [#42-2] in opposition to Defendant's motion. Plaintiff states that Defendant's

_____

[8]Of course, Defendant did not terminated Plaintiff because it did not know the name of his doctor; it terminated him because he and his doctor did not provide Defendant with requested information.

motion is "based on lies created by the Defense and its witnesses." ([#42] at ¶ 3).  He

further complains that Defendant did not present "documents or facts from [his] doctor

that supports and backs up what they have stated." *Id*. at ¶ 5.  In his memo of law,

Plaintiff insists that his ankle condition is work-related, and that Defendant is falsely

claiming otherwise.  Plaintiff also generally insists that he suffered discrimination and

retaliation.

On July 19, 2010, Plaintiff filed a further  "Reply Declaration" [#45] which, while

unclear, appears to maintain that Plaintiff's ankle injury was work related, and which

further complains that Defendant did not provide him proper health insurance after his

employment was terminated in 2009.  He also generally accuses Defendant of "lying"

and "covering up." *Id*.

On March 21, 2011, Plaintiff filed another declaration [#48], in which he complains

that Defendant did not notify his labor union when it terminated his employment.  He

further states that Defendant should not have terminated him for "so call refusing to give

them my doctor's information which is not true.  The Defendant never informed my

doctors of the closing of the medical department in April 2008." *Id*.[9]  He also states that

Defendant retaliated against him "with false documents and withholding critical

information about the matter." *Id*.

On March 24, 2011, Plaintiff and Defendant's counsel appeared before the

undersigned for oral argument.  Following such argument, Plaintiff asked the Court to

---

[9]In this regard, Plaintiff maintains that Wegmans had a medical department which closed in April 2008, though such fact appears irrelevant.  As to that, in March *2009*, Clack asked Plaintiff to send his medical information directly *to her*. *See*, [##38-27].  Moreover, Clack indicated that Plaintiff had told her that his doctor had faxed a medical note *to her attention*, but that she had not received any such note.

hold its decision in abeyance to permit him to retain an attorney.[10]  The Court agreed to allow Plaintiff until April 7, 2011, to retain an attorney.  On April 6, 2011, Plaintiff requested additional time.  However, on  April 21, 2011, Plaintiff submitted another letter to the Court, indicating that he was unable to retain an attorney, and that the Court should issue its decision.

ANALYSIS

*Rule 56*

Summary  judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), cert denied, 517 U.S. 1190 (1996).  Once that burden has been established, the burden shifts to the non-moving party to demonstrate "specific facts

---

[10]Defendant's summary judgment motion was filed on May 5, 2010, and therefore Plaintiff had already had almost a year in which to retain an attorney.

showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted). However, a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. den*. 474 U.S. 829.

It is also well settled that the party opposing summary judgment may not create a triable issue of fact "merely by submitting an affidavit that disputes his own prior sworn

testimony." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)(citations omitted).

Rather, such affidavits are to be disregarded. *Mack v. United States*, 814 F.2d 120, 124

(2d Cir. 1987) (citations omitted).

Additionally, where, as here, the non-moving party is proceeding *pro se*, the court

must interpret that party's supporting papers liberally, that is, interpret them "to raise the

strongest arguments that they suggest." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009)

(citation omitted).

*Americans With Disabilities Act*

The general legal principles applicable to ADA disability discrimination claims are

clear:

> A plaintiff suing under the ADA for disability discrimination bears the
> burden of establishing a prima facie case. In so-called
> reasonable-accommodation cases, such as this one, the plaintiff's burden
> requires a showing that (1) plaintiff is a person with a disability under the
> meaning of the ADA; (2) an employer covered by the statute had notice of
> his disability; (3) with reasonable accommodation, plaintiff could perform
> the essential functions of the job at issue; and (4) the employer has
> refused to make such accommodations.

*Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 183 -184 (2d Cir. 2006) (citation and

internal quotations omitted).  As for claims of retaliation under the ADA,

> [t]he ADA makes it unlawful for an employer to "discriminate against any
> individual because such individual has opposed any act or practice made
> unlawful by this chapter or because such individual made a charge,
> testified, assisted, or participated in any manner in an investigation,
> proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).
> ***
> Claims for retaliation are analyzed under the same burden-shifting
> framework established for Title VII cases. *See Weixel [v. Board of Educ. of
> the City of New York*], 287 F.3d [138,] 148 [(2d Cir. 2002)] (stating the
> elements of a retaliation claim under Rehabilitation Act and ADA);
> *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir.2001)

14

> ("We analyze a retaliation claim under the ADA using the same framework
> employed in Title VII cases."). In order to establish a prima facie case of
> retaliation, [the claimant] must show that: (1) he engaged in an activity
> protected by the ADA; (2) the employer was aware of this activity; (3) the
> employer took adverse employment action against him; and (4) a causal
> connection exists between the alleged adverse action and the protected
> activity.
>
> ***
>
> Once a plaintiff establishes a prima facie case of retaliation, the burden
> shifts to the defendant to articulate a legitimate, non-retaliatory reason for
> the challenged employment decision. If a defendant meets this burden, the
> plaintiff must point to evidence that would be sufficient to permit a rational
> factfinder to conclude that the employer's explanation is merely a pretext
> for impermissible retaliation.

*Treglia v. Town of Manlius*, 313 F.3d 713, 719, 721 (2d Cir. 2002) (some citations and

internal quotation marks omitted).

In this case, Plaintiff's lawsuit is based largely on the fact that one of Defendant's

employees was rude to him on one occasion, while they were discussing the fact that

Plaintiff had exhausted his disability benefits.  Even if true, this does not state a claim

under the ADA.  Additionally, Plaintiff incorrectly believes that he should have received

additional short-term disability benefits, even though he had received twenty-six weeks

of payments, which was the maximum allowable.  Moreover, while Plaintiff also makes

conclusory allegations of retaliation, there is no indication that Defendant took any

adverse action against him in response to him engaging in protected activity.  In that

regard, for example, Plaintiff has not come forward with evidence suggesting that the

termination of his employment was retaliatory.  Moreover, while Plaintiff believes that

Defendant caused his health insurance provider to deny coverage for physical therapy

treatments, he has submitted no proof in support of his theory.  Similarly, Plaintiff has

failed to come forward with any proof that Defendant provided false information to an

attorney that he had consulted.  Finally, Plaintiff has not produced evidentiary proof in admissible form that Defendant interfered with him making a hardship withdrawal from his 401(k) account.

CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment [#38] is granted, Plaintiff's cross-motion [#39] is denied, and this action is dismissed.  The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal in forma pauperis should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

SO ORDERED.

Dated: Rochester, New York
        May 4, 2011

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge